**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| WESTERN UNION HOLDINGS, | : | |
| INC., WESTERN UNION | : | |
| FINANCIAL SERVICES, INC., | : | |
| and INTEGRATED PAYMENT | : | |
| SYSTEMS, INC., | : | CIVIL ACTION NO. |
| | : | 1:06-CV-01408-RWS |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| EASTERN UNION, INC., EU | : | |
| FINANCIAL SERVICES, INC., | : | |
| YOUNG CHOE, Individually and | : | |
| d/b/a/ Check Cash Plus, EVIAN | : | |
| GROUP, INC., and ERIC | : | |
| YOUNG, | : | |
| | : | |
| Defendants. | : | |

**<u>ORDER</u>**

Before the Court are three issues: (i) the determination of whether to hold

Defendants in contempt for violation of the Modified Preliminary Injunction

Order [84],[1] (ii) Plaintiffs' Motion for Sanctions [89], and (iii) Plaintiffs'

_____

[1]As a preliminary matter, let it be noted that Plaintiffs' Motion for Order to Show Cause [88] was granted by way of the Court's Notice of Hearing on Motions [90] issued on Aug. 17, 2007.

Motion for Summary Judgment [85].  After reviewing the entire record, the

Court enters the following Order.

## Background

### I. Factual Background [2]

Plaintiff Western Union Financial Services, Inc. offers financial services

including money transfer services, money orders, bill payment services, gift

checks, electronic payment services, and printed money orders.  Plaintiff

Western Union Holdings, Inc. (collectively with Western Union Financial

Services "Western Union") is the owner of a number of federal trademark and

service mark registrations, applications, and common law marks for the

"WESTERN UNION" word mark alone and/or in combination with other

wording, and/or the "double bar" logo and design, and/or the yellow and black

trade dress (collectively the "WESTERN UNION Marks").

Defendant Choe is the owner of Check Cash Plus.  Defendant Eastern

Union is a Georgia Corporation that offers for sale money transfer services,

money orders, and travelers checks.  Defendant EU Financial Services is a

Georgia Corporation which purportedly provides tax return advances/loans and

---

[2]Because Defendants failed to submit any response to Plaintiffs' Statement of
Undisputed Material Facts [85-4], the Court shall deem these facts admitted in
accordance with Local Rule 56.1 B(2).

tax preparation services.  Choe is listed in the records on file with the Georgia

Secretary of State as the President and Chief Executive Officer of Defendant

Eastern Union, Inc., as the Chief Executive Officer, Chief Financial Officer,

President, Vice President, Secretary, and Treasurer of Defendant EU Financial

Services, Inc., and serves as the registered agent for both corporations.

Defendant Young is a Georgia resident who filed at least two trademark

applications with the United States Patent and Trademark Office ("USPTO")

for the mark EASTERN UNION.  Young is listed in that application as Eastern

Union's Chief Executive Officer.  The address listed with the Georgia Secretary

of State for Choe as the registered agent of Eastern Union and EU Financial

Services is identical to one of Choe's Check Cash Plus locations.  The same

address is listed with the Georgia Secretary of State as the principal office of

EU Financial Services.

　　　　In January 2004, Defendant Choe d/b/a Check Cash Plus entered into a

written agency agreement with Western Union North America, a unit of

Western Union Financial Services, and Integrated Payment Systems, Inc.

("IPS") under which Choe d/b/a Check Cash Plus was appointed an agent of

Western Union Financial and IPS to offer money transfer and money order

services for a term of five years.  Under the agency agreement, as amended,

Choe d/b/a Check Cash Plus was granted a non-exclusive license to use the WESTERN UNION Marks for the purpose of advertising and promoting Western Union money transfer and money order services at four Check Cash Plus locations in the Atlanta area.  Additionally, during the term of the agreement and for ninety days thereafter, Choe d/b/a/ Check Cash Plus agreed not to offer for sale any money order products or services other than those of Western Union.

On June 17, 2004, Young filed a trademark application on behalf of Eastern Union with the USPTO for the word mark EASTERN UNION for travelers check issuance, payroll accounting services, and tax preparation services.  On February 27, 2006, Young filed a trademark application with the USPTO on behalf of Eastern Union for the word mark EASTERN UNION for banking services (collectively the "EASTERN UNION Marks").

At some point during the term of the agency agreement between Choe d/b/a Check Cash Plus and Western Union, Check Cash Plus began advertising and selling check cashing services, money order services, money transfer services, and travelers checks under the name and mark EASTERN UNION.  In addition to the word mark EASTERN UNION, at least one of the signs placed

4

at the Check Cash Plus locations depicted the EASTERN UNION Marks in a yellow block font and black background.[3]

In the spring of 2006, Plaintiffs became aware that Choe was offering Eastern Union money orders, money transfer services, and travelers checks at the four Check Cash Plus locations in violation of the agency agreement.  By letter dated May 12, 2006, Plaintiffs demanded that Choe cease and desist from using the EASTERN UNION Marks and the black and yellow trade dress in connection with these services.  No response was received.  As a result, on or about May 31, 2006, Plaintiffs terminated the agency agreement.

Finally, in June 2006, Plaintiffs initiated this action, claiming that Defendants were liable for trademark and trade dress infringement, breach of contract, and breach of the duty of loyalty.  In their Answers [16, 17, 18, 19, 20], Defendants asserted antitrust counterclaims based on Plaintiffs' alleged violations of the Sherman Act.  Plaintiffs submitted a Motion to for Summary Judgment on Defendants' Antitrust Counterclaims [56], and in an Order issued on July 11, 2007 [84], the Court granted that motion.

---

[3] Defendants have stated to the Court that they have voluntarily ceased using the yellow and black color scheme.

5

## Discussion

### I. Contempt

As a preliminary matter, the Court shall determine whether Defendants should be held in contempt for violation of the Modified Preliminary Injunction Order.  After commencement of this suit, Plaintiffs moved for a preliminary injunction asking the Court to order Defendants to cease their use of the EASTERN UNION Mark in connection with certain financial services [21]. The Court granted this motion on December 20, 2006 [52].  According to the terms of the preliminary injunction, Defendants were ordered to

> [c]ease use of any name, designation or mark containing the phrase "EASTERN UNION" or any combination of the words "EASTERN" and "UNION", either alone or in combination with other words or symbols, in connection with check-cashing stores, check cashing services, money orders, money transfer services, gift checks, travelers checks, tax services, tax preparation services, tax return advances/loans, payroll accounting services, banking services, financing services, and any other financial services. . . .

(Order of Jan. 18, 2007 at 2.)

On February 8, 2007, Plaintiffs moved for an Order requiring Defendants to appear and show cause why they should not be held in contempt of the January 18, 2007 Preliminary Injunction Order [64].  Plaintiffs asserted that

6

Defendants had continued to use the EASTERN UNION Mark in connection with the prohibited financial goods and services. The Court concluded that Plaintiffs had stated a case for noncompliance with the preliminary injunction and ordered Defendants to appear to show cause why they should not be held in civil contempt. (<u>See</u> Order of Feb 23, 2007.)

After the Court entered an Order to Show Cause [68] but before a hearing could be held, Defendants' use of the EASTERN UNION Mark changed, as they began to intermittently replace the EASTERN UNION Mark with the initials "E.U."[4] Thus, the EASTERN UNION Mark and the initials E.U. (the "E.U. Mark") were being used concurrently in connection with the sale of money transfer services, money orders, travelers checks, and gift checks.

At the first show cause hearing, held on Feb. 27, 2007, Plaintiffs argued that Defendants' conduct violated the terms of the preliminary injunction and requested that the Court impose sanctions. The Court, however, chose not to impose sanctions, noting that "use of the letters 'E.U.' [did] not run afoul of the express terms of the Preliminary Injunction Order." (Order of Mar. 1, 2007 at 11.) But the Court did note that should Defendants "continue to use the letters

---

[4]While Defendants have alternately utilized the initials "EU" and "E.U.,"the Court sees no material difference between the two sets of initials and will refer only to the use of "E.U. Marks" in this Order.

'E.U.' in connection with the sale of money transfer services, money orders, travelers checks, gift checks, or other similar services, Plaintiffs remain free to move the Court to modify the terms of the preliminary injunction in this case." (Id. at 12-13.)

Following this hearing, the Court's Order found Defendants in willful contempt of the preliminary injunction [75] for their continued use of the EASTERN UNION Mark.  After the issuance of this Order, Defendants' use of the E.U. Mark in connection with their financial goods and services expanded substantially.  On March 23, 2007, Plaintiffs moved to amend the preliminary injunction to enjoin Defendants from using the initials "E.U." in connection with money orders, money transfer services, and other financial service [78]. The Court granted Plaintiff's Motion to Amend the Preliminary Injunction Order on July 11, 2007 [84]. Under the Modified Preliminary Injunction Order, Defendants were ordered to

> cease all use of any name, designation or mark
> containing the initials "E.U." or "EU", either alone or in
> combination with other words or symbols, in
> connection with check cashing stores, check cashing
> services, money orders, money transfer services, gift
> checks, travelers checks, tax services, tax preparation
> services, tax return advances/loans, payroll accounting
> services, banking services, financing services, and any
> other financial services. . . .

8

(Order of July 11, 2007 at 22.)

Roughly one month later, Plaintiffs filed yet another Motion for Order to Show Cause [88] alleging that Defendants had failed to comply with the Modified Preliminary Injunction Order.  The Court reviewed Plaintiffs' filings, concluded that Plaintiffs had again successfully stated a case for noncompliance, and ordered Defendants to appear before the Court to show cause why they should not be held in civil contempt of the Modified Preliminary Injunction Order and sanctioned.  The parties appeared at a second show cause hearing held before the Court on Aug. 28, 2007.

"Courts have inherent power to enforce compliance with their lawful orders through civil contempt."  Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir. 1991).  "A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order."  Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc., 950 F.2d 1525, 1529 (11th Cir. 1992).  "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply."  Id.  "Parties subject to a court's order demonstrate an inability to comply only by showing that they have

9

made 'in good faith all reasonable efforts to comply.' " <u>Citronelle-Mobile</u>, 943

F.2d at 1301 (quoting <u>United States v. Ryan</u>, 402 U.S. 530, 534, 91 S. Ct. 1580,

1583, 29 L. Ed. 2d 85 (1971)).  To meet this burden, the contemnor must do

more than merely assert an inability to comply.  <u>Id.</u>  Rather, the contemnor must

"produce detailed evidence specifically explaining why he cannot comply" with

the court's order.  <u>Parker v. Scrap Metal Processors, Inc.</u>, 468 F.3d 733, 740

(11th Cir. 2006).  If, and only if, the alleged contemnor makes a sufficient

evidentiary showing, then the burden shifts back to the party seeking contempt

to prove the ability to comply.  <u>Wellington Precious Metals</u>, 950 F.2d at 1529.

In this case, there can be little doubt that Defendants have failed to

comply with the terms of the Court's Modified Preliminary Injunction Order.

The Modified Order explicitly calls for the immediate cessation of all use of the

E.U. Mark in connection with check cashing stores, check cashing services,

money orders, money transfer services, and other financial services.  (Order of

July 11, 2007 at 22.)  Plaintiffs have presented evidence establishing

Defendants' continued use of the E.U. Mark in connection with the expressly

prohibited goods and services.  Specifically, on Aug. 4, 2007, the E.U. Mark

was still being displayed on signs at two of the Cash Check Plus locations.

Defendants' counsel even admitted at the Aug. 27, 2007 hearing that they had

10

failed to take down these two signs.  Plaintiffs have certainly met their burden in making a prima facie showing of a violation, shifting the burden to Defendants to make a specific showing of why they were unable to comply.

Defendants admit that they failed to comply with the modified preliminary injunction, yet they offer no evidence showing an inability to comply with the Order.[5]  Indeed, they offer no justification whatsoever for their failure to take down the two signs bearing the E.U. Marks.  In view of Defendants' failure to show that they tried in good faith to comply with the Court's Order, the Court concludes that Defendants are in willful contempt of its Modified Preliminary Injunction Order.

**A. Fines**

In view of Defendants' noncompliance with the Court's Modified Preliminary Injunction Order, Defendants will be assessed a fine of $1,000.00 to be paid into the registry of the Court.  This fine is in addition to the sanctions imposed pursuant to the Court's Order of March 1, 2007 [75], which resulted in

---

[5]Plaintiffs also allege that Defendants were continuing to sell money orders bearing the "E.U." Mark. Defendants claim that the remaining "E.U." money orders had been modified using white-out and markers and that these modified forms were only being used until new ones could be ordered, printed, and delivered to their stores.

11

fines levied against Defendants totaling $20,000.00, also to be paid into the registry of the Court.

### B. Attorney's Fees

The Court finds that Plaintiffs are entitled to recover reasonable attorney's fees associated with their motion to enforce the terms of the preliminary injunction in this case. <u>See</u> <u>Sizzler Family Steak Houses v. Western Sizzlin Steak House</u>, 793 F.2d 1529, 1535 (11th Cir. 1986) (explaining that district courts have discretion to award costs and fees to party seeking contempt). The Court hereby awards Plaintiffs attorney's fees in the amount of $1,500 to be paid by Defendants.

## II. Motion for Sanctions

Plaintiffs have moved for sanctions to be imposed on Defendants for their allegedly frivolous counterclaims. After considering all arguments raised by both parties, the Court finds that Defendants' conduct with regard to their antitrust counterclaims does not warrant the imposition sanctions by the Court. Therefore Plaintiffs' Motion for Sanctions is **DENIED**.

## III. Motion for Summary Judgment

Also before the Court is Plaintiffs' Motion for Summary Judgment on their claims for trademark infringement and trade dress infringement. Plaintiffs

AO 72A
(Rev.8/82)

seek only the relief of a permanent injunction and the recovery of attorneys' fees.[6]

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The applicable substantive law identifies which facts are material, and a fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 247, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the non-moving party. Id. at 255; Adickes v. S.J. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 142 (1970); Clark v. Coats & Clark, Inc., 929 F.2d 604, 606 (11th Cir. 1991).

---

[6]Plaintiffs do not seek any money damages. See Pl.'s Brief in Support of Pl.'s Mot. for Summary Judgment [85-3] at 23. Because Plaintiffs seek only a permanent injunction and attorneys' fees, the Court will treat their breach of contract and breach of duty of loyalty claims as voluntarily dismissed, as these are claims for damages, not injunctive relief.

If the movant meets this burden, the non-moving party then has the burden of showing that summary judgment is not appropriate by setting forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Thornton v. E.I. du Pont de Nemours & Co., 22 F.3d 284, 288 (11th Cir. 1994). The non-moving party cannot rely on his pleadings, but must file a response that includes other evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997); Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 439 (11th Cir. 1996). Mere conclusory allegations and assertions are insufficient to create a disputed issue of material fact. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

### B. Summary Judgment for Trade Dress Infringement

As to Plaintiffs' Motion for Summary Judgment for trade dress infringement, the Court concludes that issues of material fact exist with regard to Plaintiffs' exclusive right to use yellow and black block lettering in connection with financial services. Thus, Plaintiffs' Motion for Summary Judgment for trade dress infringement is **DENIED.**

14

### C. Summary Judgment for Trademark Infringement[7]

Under the Lanham Act, a defendant is liable for infringement if, without consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  "A plaintiff seeking to prevail on a trademark infringement claim must show 1) that he had a valid trademark and 2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two."  <u>Gift of Learning Foundation, Inc. v. TGC, Inc.</u>, 329 F.3d 792, 797 (11th Cir. 2003) (per curiam) (quoting 15 U.S.C. § 1127).  It is undisputed that the WESTERN UNION Mark is a valid trademark and has priority over the EASTERN UNION Marks and E.U. Marks. The Court now turns to determine whether there is a likelihood of confusion.

In assessing likelihood of confusion, courts in the Eleventh Circuit consider seven factors:

> (1) the strength of the plaintiff's mark; (2) the
> similarity between the plaintiff's mark and the

---

[7]Since the Court had already made a determination of Plaintiffs' likelihood of success on the merits for their trademark infringement claim pursuant to the Court's rationale in issuing a Preliminary Injunction, and since very few new facts or legal arguments have arisen since that time, the Court's reasoning in its Order of Dec. 20, 2006 issuing the original Preliminary Injunction is largely applicable to its present inquiry.

> allegedly infringing mark; (3) the similarity between
> the products and services offered by the plaintiff and
> defendant; (4) the similarity of the sales method; (5)
> the similarity of advertising methods; (6) the
> defendant's intent, e.g., does the defendant hope to
> gain competitive advantage by associating his product
> with the plaintiff's established mark; and (7) actual
> confusion.

Alliance Metals, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000).

The Court will now address each factor in turn.

    1.    Strength of the Mark

In assessing likelihood of confusion, the first factor for the Court to consider is the strength of the plaintiff's mark. "The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives." Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). "The primary indicator of trademark strength measures the logical correlation between a name and a product." Freedom Sav. and Loan Ass'n v. Way, 757 F.2d 1176, 1182 (11th Cir. 1985). "The relationships between names and products fall into several classifications, each one more heavily protected than the last: generic, descriptive, suggestive, arbitrary or fanciful, and coined." Id. "The categories

are based on the relationship between the name and the service or good it describes." <u>Frehling</u>, 192 F.3d at 1335.

> Generic marks are the weakest and not entitled to protection–they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor).  Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold).  Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive.  For instance, "penguin" would be suggestive of refrigerators.  An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services).  Arbitrary marks are the strongest of the four categories.

<u>Id.</u> (internal citations and quotations omitted).

Here, Plaintiffs contend that the WESTERN UNION Marks are arbitrary and entitled to broad protection.  The Court determined in its Order of Dec. 20, 2006 [52] that the WESTERN UNION Marks were arbitrary and deserving of very strong protection.  While Defendants admit in their brief that the strength of a mark is one of the two most important factors in determining likelihood of confusion, they fail to raise any argument whatsoever with regards to this factor.  (<u>See</u> Def.'s Br. in Opp. to Pl.'s Mot. for Summ. J. [91] at 9-10.)  As there is no genuine issue of material fact with regard to the strength of the mark,

the Court determines that this factor weighs heavily in favor granting Plaintiffs'

Motion for Summary Judgment.

    2.    <u>Similarity Between the Marks</u>

    The second factor the Court must consider is the similarity between the

plaintiff's mark and that of the alleged infringer.  In evaluating the similarity of

marks, the Court must consider "the overall impression created by the marks,

including a comparison of the appearance, sound and meaning of the marks, as

well as the manner in which they are displayed."  <u>E. Remy Martin & Co., S.A.</u>

<u>v. Shaw-Ross Intern. Imports, Inc.</u>, 756 F.2d 1525, 1531 (11th Cir. 1985).  "The

underlying purpose in considering the similarity of marks as an indicator of

likelihood of confusion is that the closer the marks are, the more likely

reasonable consumers will mistake the source of the product that each mark

represents.  The probability of this potential confusion is the touchstone."

<u>Frehling</u>, 192 F.3d at 1337.

    Plaintiffs contend that the marks at issue here are extremely similar.  In

support of this position, Plaintiffs point to the fact that only the first two letters

of the first word are different, the second word is identical, the first words of

both marks are "directional indicators" which each end in the same five letters,

and that Defendants have displayed their mark in yellow block font on a black

18

background which is virtually identical to the trade dress utilized by Plaintiffs.

In response, Defendants argue that the marks are not literally similar, as the

words "Eastern" and "Western" are literal opposites of one another.  Defendants

even go so far as to assert that a jury could find that the EASTERN UNION

Marks are the opposite of the WESTERN UNION Marks, regardless of the

marks' color schemes.[8]

       As the Court has previously stated, the marks at issue in this case, while

not identical, are decidedly similar.  (See Order of Dec. 20, 2006 at 13-14.)  As

noted above, it is "the overall impression created by the marks, including a

_____

       [8]Defendants point to Board of Regents of the University System of Georgia v.
Buzas Baseball, Inc., 176 F.Supp.2d 1338 (N.D. Ga. 2001), as a case where a court
found a genuine dispute as to whether phonetically-similar word marks were similar.
(See Def.'s Br. in Opp'n. to Mot. for Summ. J. at 11-12.)  Defendants insist that since
other courts have "found similar sounding marks to be dissimilar for the purposes of
evaluating a summary judgment motion," this Court should find that "Eastern Union"
(or "E.U.") and "Western Union" are not similar.
       However, Defendants' reliance on this case is misplaced.  Defendants claim
that the court in Buzas Baseball found a genuine issue of material fact as to whether
the word marks "Buzz" and "Buzzy" were similar.  (See Def.'s Br. in Opp'n to Mot.
for Summ. J. at 11-12.)
       But in fact, two sets of marks were at issue in the Buzas Baseball case: (1) the
word marks "Buzz" and "Buzzy" and (2) the design marks depicting Georgia Tech's
"Yellow Jacket Design" mark and Buzas Baseball's "bee-like logo." Id. at 1344-45.
A careful reading of the case shows that the court found with regard to the word marks
"that the two 'Buzz' marks are similar in their sound, their appearance, and the
manner in which they are used" and that "this factor favors [the plaintiff]." Buzas
Baseball, 176 F.Supp.2d at 1352.  The court then went on to find that the two design
marks depicting bee-like characters were only vaguely similar and that a genuine issue
of material fact existed as to whether these design marks were similar. Id.

comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed," that guides this inquiry.  As this Court put it, "[e]ach mark consists of two words, differing only by two letters.  While they differ in some degree aurally, the overall impression created by attaching a directional indicator to the word 'union' is remarkable."  (Order of Dec. 20, 2006 at 13.)  Defendants have not presented sufficient evidence to convince the Court that a reasonable jury could find that the two marks are not similar.  Thus, while the marks are not identical, this factor certainly weighs in favor of Plaintiffs due to the noted similarity between the marks.

      3.    <u>Similarity Between the Products and Services</u>

The third factor the Court must consider is the similarity between the products and services offered by the plaintiff and the defendant.  "This factor requires a determination as to whether the products are the kind that the public attributes to a single source."  <u>Frehling</u>, 192 F.3d at 1338.  The issue is not whether the purchasing public can readily distinguish between the products of the respective parties, but rather whether the products are so related in the minds of consumers that they get the sense that a single producer is likely to produce both.  <u>Id.</u>

AO 72A
(Rev.8/82)

Here, the Court has already determined that Plaintiffs and Defendants offer "virtually identical products and services." (Order of Dec. 20, 2006 at 14.) Both Plaintiffs and Defendants offer money orders and money transfer services under their respective marks. The Court is unconvinced by Defendants' argument that the money order services differ in that Plaintiffs' services extend worldwide while Defendants' are only available in Georgia. The fact remains that the purchasing public could still attribute these services to one source, even if the one service extended worldwide while the other was tailored for use within the state of Georgia.

Defendants also argue that the money transfer services differ in that Plaintiffs' services extend worldwide while Defendants' are only utilized to transfer money to Korea for its Korean clientele. As previously determined, this contention is unsupported by any evidence and is contrary to representations that were made on Defendants' website, which offered domestic and international money transfer services. (Order of Dec. 20, 2006 at 14; see Cunningham Decl. Ex. I [30-7] at 2.) Defendants have failed to come forward with any evidence supporting this contention.

Furthermore, Defendants argue that the products are substantially different in that Eastern Union offers travelers checks for sale, while Western

Union does not.  In its Order of Dec. 20, 2006, the Court noted a product

offered on Defendants' website denominated "Travelers Cheque / Gift Cheque,"

and the Court further noted that Western Union also offers gift check services

(Order of Dec. 20, 2006 at 16 (citing Cunningham Decl. [30] Ex. I at 2 and

Norden Decl. [33] ¶ 2).)  Thus, contrary to Defendants' arguments, on the

record before this Court there is a high degree of similarity between the

products and services offered.

And finally, Defendants assert that their money transfer services differ

from those of Western Union because Defendants offer only bank wire

transfers, while Western Union "is synonymous with . . . near real time, point to

point money transfers."  (Def.'s Br. in Opp. to Mot. for Summ. J. at 14.)  The

Court once again finds this argument unpersuasive.  Contrary to Defendants'

contention, the facts show that Western Union offers bank wire services

identical to those of Defendants.  Moreover, even if the purchasing public could

discern between bank wires and the point-to-point transfer services Defendants

contend are offered by Plaintiffs, those services are of the type that consumers

would likely attribute to a single source.

None of Defendants' arguments convince the Court that a reasonable jury

could find that the products and services offered by the parties are not similar.

22

Thus, as there is no genuine dispute of material fact, this Court concludes that there is a high degree of similarity between the products and services offered and that this factor weighs strongly in favor of Plaintiffs.

    4.    <u>Similarity of the Sales Methods</u>

The fourth factor the Court must consider is the similarity between the sales methods employed by the plaintiff and defendant. "This factor takes into consideration where, how, and to whom the parties' products are sold." <u>Frehling</u>, 192 F.3d at 1339. As related to this inquiry, "[d]issimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." <u>Id.</u> (quoting <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 262 (5th Cir. 1980)). While direct competition between the parties is not required, "evidence that the products are sold in the same stores is certainly strong." <u>Id.</u> Moreover, the parties' outlets and customer bases need not be identical, but some degree of overlap should be present. <u>Id.</u>

In this case, the retail outlets and predominant customers for the products and services offered by Plaintiffs and Defendants are virtually identical. Both offer their money transfer and money order services through small, independently-owned check cashing stores. Indeed, Defendant Choe d/b/a

Check Cash Plus was an authorized agent of Western Union and simultaneously offered both Eastern Union and Western Union money transfer and money order services out of the same establishments.  There is certainly a geographic overlap in the relevant markets, and the Court has been presented with no credible evidence that the relevant consumer groups differ.  Moreover, the Court's conclusion that the products and services offered are identical compels the conclusion that the predominant consumers of Plaintiffs' and Defendants' products are the same.  Defendants offer no evidence to challenge this conclusion.  Therefore, this factor, too, weighs heavily in Plaintiffs' favor.

     5.    <u>Similarity of Advertising Methods</u>

The fifth factor the Court must consider requires an examination of "each party's method of advertising."  <u>Id.</u>  In this case, both parties advertise their products through internet websites, through signage posted in retail locations, and brochures distributed at those locations.  (<u>See</u> Foster Decl. [35] Exs. A, E, F, H, Q; Cunningham Decl. [30] Exs. I, M, O, P.)  Defendants have offered no evidence disputing this point.  Thus, this factor similarly weighs in Plaintiffs' favor.

24

6.    <u>Defendants' Intent</u>

"That a latecomer adopts another's name or mark, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for any court." <u>Sun Banks of Fla., Inc. v. Sun Fed. Sav. and Loan Ass'n</u>, 651 F.2d 311, 318-19 (11th Cir. 1981).  Indeed, "[i]f it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." <u>Frehling</u>, 192 F.3d 1340.

Here, Defendant Choe was an authorized agent for Plaintiffs and was granted a non-exclusive license to use the WESTERN UNION Marks in connection with the sale of Western Union products in the four Check Cash Plus stores.  During the period of her agency, and in direct contravention of the contract between herself and Western Union, Choe began to offer for sale money transfer and money order services under the EASTERN UNION Marks.  Thus, Choe was certainly aware of the use of the WESTERN UNION Marks in connection with these financial services.

As this litigation has proceeded, Defendants have obstinately failed to comply with this Court's instructions to move away from prohibited uses of the

25

EASTERN UNION and E.U. Marks.  Defendants began by creating a mark that not only sounded like the WESTERN UNION Marks but also had a similar appearance to the WESTERN UNION Marks, emulating the yellow-and-black, block-lettered design.  Subsequently, Defendants began to employ EASTERN UNION Marks with other colors and other lettering styles concurrently with their original design.  Following the issuance of the initial Preliminary Injunction, Defendants failed to comply with this Court's order to cease all use of the EASTERN UNION Marks but instead continued to use the mark while gradually introducing the E.U. Mark.  This concurrent use of the EASTERN UNION Marks and the E.U. Marks helped the Defendants to maintain the connection in consumers' minds between the original mark and its initials. Recognizing that the use of such tactics must be forestalled, the Court issued a Modified Preliminary Injunction directing Defendants to immediately cease use of the E.U. Marks in connection with their financial services.  But, as determined above, Defendants violated this order as well, displaying the E.U. Marks concurrently with their newly chosen marks.  Thus at every step along the way, Defendants have attempted to carry with them the good will derived from the potential confusion between the WESTERN UNION Marks and the EASTERN UNION Marks.

Defendants insist that they did not intend to create consumer confusion. In support of this contention, they point to the fact that they clearly demarcate their products and services with the EASTERN UNION Mark, to alert customers to that particular product's origin.  What Defendants fail to realize is that it is precisely this demarcation that gives rise to the potential for consumer confusion.  Defendants have labeled their products and services with a mark that looks and sounds likes Plaintiffs.  Defendants insist that consumers recognize the difference between the two marks, but they offer no evidence to support this assertion.  Furthermore, Defendants have not offered any independent rationale for their choice of mark that might demonstrate that it was chosen for some reason other than the desire to benefit from the good reputation associated with Plaintiffs' marks.

As there is no genuine issue of material fact with regard to Defendants' intent, the Court can only conclude that Defendants used the EASTERN UNION Marks in connection with money transfer and money order services with the desire to derive benefit from the well-established services and products offered by Western Union.  Accordingly, this factor, as has each of the preceding ones, militates strongly in favor of finding a likelihood of confusion.

AO 72A
(Rev.8/82)

7.      Actual Confusion

The final factor the Court must consider is any evidence of actual confusion in the marketplace.  "It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion."  <u>Frehling</u>, 192 F.3d at 1340.  But, such evidence is not a prerequisite.  <u>Id.</u>; <u>Domino's Pizza</u>, 615 F.2d at 263 (stating that "evidence of actual confusion is not necessary to a finding of likelihood of confusion").  "Instead, actual confusion is merely one of several factors that may be relevant in analyzing whether there is a likelihood of confusion between two marks," <u>Montgomery v. Noga</u>, 168 F.3d 1282, 1302 (11th Cir. 1999), and courts must assess this factor in light of the particular facts of each case.  <u>Frehling</u>, 192 F.3d at 1340.

On this point, neither party has submitted much evidence.  Plaintiffs offer as evidence the declaration of Carla Foster, a paralegal employed by Plaintiffs' counsel.  Ms. Foster has stated that while visiting a Check Cash Plus store to purchase a money order, she "heard another customer ask the clerk, 'Who will be handling my money transfer, Western Union or Eastern Union?' " (Foster Decl. [35] at ¶ 3.)  For their part, Defendants had previously submitted evidence

in the form of an informal survey, which the Court rejected due to flaws in its methodology.  No further admissible evidence has been offered by Defendants.[9]

Despite the lack of probative evidence on this point, the law is clear that Plaintiff need not establish actual confusion in order to make a sufficient showing of likelihood of confusion.  And because each of the other six factors weighs so heavily in Plaintiffs' favor, the Court concludes that Plaintiffs have established likelihood of confusion and are entitled to summary judgment on their claim of trademark infringement.  Defendants have asserted conclusory allegations and assertions that are largely unsupported by any actual evidence and thus have failed to raise sufficient evidence to create a genuine issue of material fact.  For the foregoing reasons, Plaintiffs' Motion for Summary Judgment on their claim for trademark infringement is hereby **GRANTED**.

## IV. Relief Sought

### A. Permanent Injunction

Under the principles of equity, a plaintiff requesting a permanent injunction must satisfy a four-factor test:

---

[9]Defendants did retain an expert who conducted a survey, but since the Defendants never identified any survey expert prior to the close of discovery, any evidence offered through him is inadmissible.  <u>See</u> Fed. R. Civ. P. 26(a)(2)(A) ("[A] party must disclose to the other parties the identity of any witness it may use at trial under Federal Rule of Evidence 702, 703, or 705.")

> (1) that [the plaintiff] has suffered an irreparable
> injury; (2) that remedies available at law, such as
> monetary damages, are inadequate to compensate for
> that injury; (3) that, considering the balance of
> hardships between the plaintiff and defendant, a
> remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent
> injunction.

eBay, Inc. v. MercExchange, L.L.C., 126 S.Ct. at 1837, 1839 (2006).  Thus, the

standard for a permanent injunction is essentially the same as for a preliminary

injunction except that the movant must show actual success on the merits

instead of a likelihood of success on the merits.  Siegel v. Lepore, 234 F.3d

1163, 1213 (11th Cir.2000).  Plaintiffs had already succeeded in gaining a

preliminary injunction.  (See Order of Dec. 20, 2006, Order of Jan. 18, 2007,

and Order of July 11, 2007.)  As determined above, they have also shown actual

success on the merits of their trademark infringement claim.

Accordingly, Defendants Eastern Union, Inc., EU Financial Services,

Inc., Young Choe, individually and d/b/a Check Cash Plus, Evian Group, Inc.,

and Eric Young, and their respective officers, agents, employees, successors

and assigns, and any other person or entity in active concert or participation

with them are hereby **PERMANENTLY ENJOINED** from:

(1) All use of any name, designation or mark containing the phrase "EASTERN UNION" or any combination of the words "EASTERN" and "UNION," either alone or in combination with other words or symbols, in connection with check cashing stores, check cashing services, money orders, money transfer services, gift checks, travelers checks, tax services, tax preparation services, tax return advances/loans, payroll accounting services, banking services, financing services, and any other financial services;

(2) All use of any name, designation or mark containing the phrase "WESTERN UNION," or any other mark, word, designation or name similar to the WESTERN UNION Marks which is likely to cause confusion, mistake or to deceive, in connection with check cashing stores, check cashing services, money orders, money transfer services, gift checks, travelers checks, tax services, tax preparation services, tax return advances/loans, payroll accounting services, banking services, financing services, and any other financial services; and

(3) All use of any name, designation or mark containing the initials "E.U." or "EU" either alone or in combination with other words or symbols, in connection with check cashing stores, check cashing services, money orders, money transfer services, gift checks, travelers checks, tax services, tax

31

preparation services, tax return advances/loans, payroll accounting services, banking services, financing services, and any other financial services.

## B. Attorney's Fees and Costs

The Court also finds that Plaintiffs are entitled to recover their costs and reasonable attorney's fees associated with bringing this action for trademark infringement.  Plaintiffs shall file a statement of their costs and fees with the Court not later than ten (10) days from the date this Order is entered on the docket.  Defendants shall then have five (5) days in which to file any response. If a response is filed, Plaintiffs shall have an additional five (5) days from the date of that filing in which to file a reply.

## Conclusion

For the reasons stated herein, Plaintiffs' Motion for Order to Show Cause [88] having been previously **GRANTED**, and the Court having found Defendants in contempt of the Court's previous orders, Defendants are assessed a fine of $1000.00 for this most recent contempt.  This fine is in addition to the $20,000.00 in fines arising from Defendants' previous contempt.  Further, Defendants shall pay to Plaintiffs $1500.00 as attorney's fees for the bringing of their motion.  Plaintiffs' Motion for Sanctions [89] is **DENIED**.  Plaintiffs'

Motion for Summary Judgment [85] is **DENIED**, **in part**, and **GRANTED**, **in part**.  The Motion is denied as to the claim of trade dress infringement and granted as to the claim of trademark infringement.  Plaintiffs are entitled to attorney's fees for the claim of trademark infringement claim and shall submit their statement of costs and fees as provided above.

   **SO ORDERED**, this   7th   day of September, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE